HENRY D. BROWN, Respondent, *v.* EUGENE L. GAREY et al., as Executors of JAMES M. HOYT, Deceased, et al., Individually and as Copartners under the Firm Name of PRINCE & WHITELY, Appellants, Impleaded with Others.

(Argued March 11, 1935; decided April 16, 1935.)

*Emil Weitzner, Samuel H. Kaufman, Earl J. Garey* and *David G. Haskins* for appellants.

*John F. Caskey* and *John R. McCullough* for respondent.

CROUCH, J. The defendants were stockbrokers doing business under the firm name of Prince & Whitely. On September 9, 1930, the plaintiff delivered to the firm a certificate for 65 shares of Pere Marquette Railway stock

for the sole purpose of having it sold on the New York Stock Exchange. On September 30, 1930, the firm, without plaintiff's authority, knowledge or consent, pledged the certificate with other securities to secure a loan of $250,000. On October 9, 1930, a petition in bankruptcy was filed against the firm. On the same date the pledgee liquidated the loan by selling the certificate together with other securities. A demand upon the receiver in bankruptcy for the return of the certificate was refused. An offer of composition was subsequently made and confirmed by the bankruptcy court. Plaintiff received his distributive share with a reservation of any rights against the defendants individually. This action is for the conversion of plaintiff's certificate of stock. The defense is the composition in bankruptcy. The single question is whether the conversion was a willful and malicious injury to property within the meaning of section 17 (2) of the Bankruptcy Act (Mason's U. S. Code, tit. 11, ch. 3, § 35), which excludes liability for such injuries from discharge in bankruptcy.

" There is no doubt that an act of conversion, if willful and malicious, is an injury to property within the scope of this exception. * * * But a willful and malicious injury does not follow as of course from every act of conversion, without reference to the circumstances." (*Davis* v. *Ætna Acceptance Co.*, 293 U. S. 328, 332.)

The court must examine the circumstances of each particular case and say whether it finds among them the elements which the law has come to accept as badges of willfulness and legal malice. It has been said that " a willful disregard of what one knows to be his duty, an act which is against good morals, and wrongful in and of itself, and which necessarily causes injury and is done intentionally, may be said to be done willfully and maliciously, so as to come within the exception." (*Tinker* v. *Colwell*, 193 U. S. 473, 487.) If the phraseology of that statement trenches unduly on the domain of morals (Cf.

Holmes, Collected Legal Papers, p. 171), we may overlook it in part and still find a legal test. A wrongful act done intentionally which necessarily causes harm and is without just cause or excuse, constitutes a willful and malicious injury. (*Kavanaugh* v. *McIntyre*, 210 N. Y. 175, 182; affd., 242 U. S. 138; and cf. *Matter of Levitan*, 224 Fed. Rep. 241, 243.) The test may be exemplified. In the *Kavanaugh* case the defendant brokers undertook to hold as collateral security stock certificates worth six times the amount of the debt. The day after receipt of the certificates they began deliberately to sell them. By successive sales over a period of a few weeks all had been disposed of and the avails appropriated by defendants. The conversion was larcenous in its nature and the injury was held to be willful and malicious. So too, in *Andrews* v. *Dresser* (214 N. Y. 671), where plaintiff gave defendant a sum of money expressly to pay a certain draft and defendant, refusing so to apply it, used the money for his own purposes. On the other hand, in *Wood* v. *Fisk* (215 N. Y. 233), defendant brokers, authorized by plaintiff to repledge his collateral within a certain limit, exceeded that limit and the collateral was lost through sale by the subpledgee. So far as there was any willful conversion, it was held partial — since it left the general property in plaintiff — and technical rather than absolute and malicious. Since a wrongful intent is not an essential element of conversion (*Boyce* v. *Brockway*, 31 N. Y. 490, 493; *Laverty* v. *Snethen*, 68 N. Y. 522, 527), an act of dominion done under mistake or misapprehension, and without conscious intent to violate right or authority, may yet be a conversion; but it is not a willful and malicious conversion. Even though the mistake or misapprehension is due to negligence, the rule can be no different."

" The circumstances under which the conversion occurred were these: In defendant's New York office there were two hundred and fifty employees working under a systematized

business organization, which was headed by an office manager. As part of the ordinary business of such a concern, the borrowing of money upon collateral which the firm had the right to pledge was a common occurrence. Under the system used in the office, securities not subject to hypothecation were marked definitely as to ownership and were placed for safe-keeping in a custodian account with the Irving Trust Company. The other securities were kept in large drawers. When a loan had been arranged for, the collateral for the loan was made up by the loan clerks under the supervision of the chief loan clerk. The necessary securities needed for each loan were taken by the loan clerks from these drawers, under a general authority and without consulting any member of the firm in each particular instance. Securities so taken and used as collateral were not reported to any of the partners. The list of collateral to secure the $250,000, which included plaintiff's certificate, was made up and the securities taken from the drawer in the ordinary course of business. Neither the office manager nor the chief loan clerk could explain the inclusion of plaintiff's certificate in that list. So far as appears, that list contained no other unauthorized pledge.

Giving the plaintiff the benefit of all inferences which may be drawn from the evidence, the most that can be said is that the conversion was the result of negligence. The burden which rested upon plaintiff (*Kreitlein* v. *Ferger*, 238 U. S. 21) to show that the defendants either directly or vicariously pledged plaintiff's stock intentionally, without just cause or excuse and knowing that it would necessarily cause him harm, has not been met.

It remains to consider the case of *Heaphy* v. *Kerr* (190 App. Div. 810; affd., 232 N. Y. 526), upon which the plaintiff largely relies. There the defendants hypothecated a customer's securities under circumstances which brought them within the terms of Penal Law, section 956, and made their act a felony. That seems reasonably

clear, because their chief contention was that they were authorized by the customer to do what they did. It necessarily follows that they acted intentionally and with knowledge, and thus consented or assented to the hypothecation. (*People* v. *Sugarman*, 216 App. Div. 209; affd., 243 N. Y. 638; *People* v. *Lowe*, 209 App. Div. 498.) The relevant circumstances here include no such fact, and the finding of the Appellate Division to the contrary is without support in the evidence. That the defendants, under the office system adopted and used by them, did not in person select or supervise the selection of securities to be pledged, does not close the gap. There is no proof that the defendants personally knew of the acts of their employees prior to or at the time the unauthorized pledge was made; nor is there proof that their office system and organization differed from that in common use so as to render likely or reasonably to be expected by them the unauthorized acts of subordinates. The possibility of a criminal conviction of defendants under Penal Law, section 956, on the evidence here is out of the question.

The judgment of the Appellate Division should be reversed and that of the Trial Term affirmed, with costs in this court and in the Appellate Division.

CRANE, Ch. J. (dissenting). My view regarding this case differs from the opinion written by Judge CROUCH.

The evidence presents a question of fact which the Appellate Division has decided in favor of the plaintiff. That court found that on September 30, 1930, the defendants wrongfully pledged sixty-five shares of Pere Marquette Railway Company common stock, registered in the name of the plaintiff with the First of Boston Corporation, to secure a loan made to the defendants; that this conversion constituted a willful and malicious injury to the property of another, within the meaning of section 17 of the Bankruptcy Act of 1898.

The only point for us to consider is whether there is evidence to sustain these findings of the Appellate

Division, or whether they are against the weight of evidence. In my judgment these findings should be sustained.

The Bankruptcy Act, section 17, as amended in 1903, reads: " A discharge in bankruptcy shall release a bankrupt from all of his provable debts, except such as * * * (second) are liabilities for obtaining property by false pretenses or false representations, or for willful and malicious injuries to the person or property of another," etc.

The defendants concede that the plaintiff's property was converted by them, and that they would be liable to damages for the value thereof, were it not for their discharge in bankruptcy. Therefore, we must determine whether there is evidence to prove that, within the meaning of this exception in the Bankruptcy Law, they were guilty of willful and malicious injury.

A conversion is an injury to property, but the exception requires the conversion to be willful. An intentional conversion is a willful conversion. The question squarely presented to the triers of fact in this case was whether the conversion was an accident or a mistake, or whether it was done with intention to appropriate the plaintiff's property to the use of the defendants. On the trial of its case the defendants' counsel argued that the sole point was one of intention. The exception covers *liabilities* for willful and malicious injury. These defendants clearly are liable for any willful and intentional act of conversion committed for their benefit by their employees. Could a liability, created by the defendants' manager obtaining money for them by false pretenses, be discharged?

In *McIntyre* v. *Kavanaugh* (242 U. S. 138) it was held that partners are individually responsible for torts committed by their firm, while acting within the general scope of its business, whether they personally participated therein or not, and that an innocent partner would not be discharged in bankruptcy where another one had converted stock. Partners are agents one for the other. (*Irwin* v.

*Williar*, 110 U. S. 499.)   In the same way these partners here are liable for the conversion by their employees, committed within the scope of their employment.   Their conversion, if not accidental, constitutes a liability in these defendants which prevents discharge in bankruptcy.

The defendants exercised no supervision over their clerks in the selection of securities to be sold or pledged — virtually shut their eyes to their transactions — and now seek discharge in bankruptcy from a flagrant conversion of the plaintiff's securities by their employees, in an attempt to save the firm from bankruptcy.   In fact the inference may be drawn that these defendants, or one or more of them, knew that the stocks were to be illegally taken for their benefit.   Even as early as *Wood* v. *Fisk* (215 N. Y. 233, at p. 241) this court intimated that an out and out sale of the securities in that case, as distinguished from a repledge, would have been willful and malicious, within the Bankruptcy Act.

What are the facts here to justify my statement that there was evidence to sustain the findings of the Appellate Division, that the liability sought to be discharged was one for willful and malicious injury?   The plaintiff owned sixty-five shares of common stock of the Pere Marquette Railway Company.   He was not a customer of the defendants and had no previous dealings with them.   At their Philadelphia office he gave to them his sixty-five shares to be sold.   This was on the 9th day of September, 1930.   On the 30th day of September, 1930, Prince & Whitely were in financial difficulties.   They were on the verge of bankruptcy.   Their head bookkeeper was asked this question:   " Q.  Mr. Palamara, this daily report, Defendants' Exhibit D, shows that the firm of Prince & Whitely was solvent on September 30, doesn't it?   A.  I would not say that."

In order to obtain a loan of $250,000 to help them out they pledged, with other securities, on this 30th day of September, 1930, the plaintiff's shares of stock, scheduled

on their own sheets, making up the loan security, as stock belonging to Henry D. Brown. Nine days later a petition in bankruptcy was filed against them. The defendants failed to offer any explanation as to how property given to them for sale was converted to their own use and applied to their own financial benefit. None of the defendants testified. Two of their employees, the supervisor of the cashier's cage, and the office manager, say that they cannot explain how such a thing happened. One was asked: " Q. Do you know how it happened — yes or no? The Witness: No, I do not." The other: " Q. How did it come about that these securities were pledged? The Witness: There can be no explanation. Q. Do you know? A. No."

These certificates of the plaintiff, we must remember, were not given as collateral or pledged with the defendants; they were handed to them for the sole purpose of sale, the proceeds to be turned over to the plaintiff. Who took them; what was done with them; where they were put, or how they were kept no one seems to know. Certificates for safe-keeping were maintained with the Irving Trust Company. Others were kept by the defendants in their box or drawers. Whether they were commingled, or how they were kept, is not explained; nothing is told us about these sixty-five shares of Pere Marquette common — who received them or where they were placed. The defendants and their employees, as well as their records, show blank when an explanation is requested.

What, under all these circumstances, would any reasonable man infer? Prince & Whitely were on the verge of bankruptcy. They needed money badly. They had to have $250,000 from the First of Boston Corporation, and were obliged to give security, and, lacking any other explanation, the inference may be fairly drawn that these securities of the plaintiff were intentionally taken, together with others, irrespective of ownership.

There is nothing peculiar about a stockbroker which gives to him privileges other agents do not possess. If

I take my furniture or my jewelry to an auctioneer or broker to sell for me, and I find after a few days that the property has been sold and the money used by the agent for his own purposes, what is the fair inference — that he made a mistake or that he stole it? When he tells me upon inquiry that he does not know how it happened, that he cannot explain it, the conclusion naturally is that his ignorance is a cloak for his wrong.

Our Penal Law, section 956, provides that any broker who, having stocks in his possession, without having any lien or special property therein, sells them without his customer's consent, is guilty of a felony; and every member of a firm of brokers who assents to the doing of any such act is also guilty.

Larceny, under our law (section 1290 of the Penal Law), is committed, when a person, having possession of the property of another as agent, appropriates the same to his own use.

It is unnecessary to say whether or not the unexplained facts of this case make out *prima facie* the commission of a felony (*People* v. *Friedman*, 149 App. Div. 873; *McDonald* v. *State*, 56 Fla. 74, 78), because the willful and malicious injury to property referred to in the Bankruptcy Act is not confined to crimes committed by the bankrupt personally. (*McIntyre* v. *Kavanaugh*, 242 U. S. 138.) Neither is it sufficient to say that the mere ignorance upon the part of the two employees is an explanation or an exculpation. They were interested witnesses whose testimony could have been rejected by the triers of fact.

There was, therefore, ample evidence to sustain the finding of the Appellate Division, that this liability for the conversion of the plaintiff's stock was not discharged in bankruptcy. For this reason the judgment below should be affirmed.

LEHMAN, O'BRIEN, HUBBS and LOUGHRAN, JJ., concur with CROUCH, J.; CRANE, Ch. J., dissents in opinion; FINCH, J., not sitting.

Judgment accordingly.